IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANCIS M. BURKE            :           CIVIL ACTION
                            :
        v.                  :
                            :
TWP. OF CHELTENHAM, et al.   :           NO. 10-1508

MEMORANDUM

Dalzell, J.                              October 5, 2010

        Plaintiff Francis W. Burke ("Burke") sues defendants --
consisting of the Township of Cheltenham ("Township") and a group
of police officers working for the Township -- on an array of
federal civil rights and pendent state tort claims arising out of
Burke's April 6, 2008 arrest for public drunkenness and
disorderly conduct.  Burke alleges that he was unnecessarily
restrained, strip searched, and physically assaulted in the
course of his arrest, and then charged, without basis, with
further criminal offenses in retaliation for filing a complaint
about the April 6 incident.

        Burke brings suit against varying combinations of
defendants for (1) unlawful search and seizure, (2) false arrest
and false imprisonment, (3) use of excessive force, (4) malicious
prosecution, (5) retaliation in violation of the First Amendment,
and (6) failure to supervise -- all under 42 U.S.C. § 1983 -- as
well as for (7) assault and battery and (8) intentional
infliction of emotional distress under Pennsylvania tort law.

Defendants move for partial dismissal of Burke's claims under Federal Rule of Civil Procedure 12(b)(6), arguing that (1) certain of Burke's civil rights claims are barred by his ultimate conviction on the charge of disorderly conduct, (2) his Fourteenth Amendment claims are subsumed by his Fourth Amendment claims, (3) his prayer for punitive damages may not be granted against a governmental entity, (4) he has failed to identify a custom, practice, or policy justifying municipal liability, and (5) the individual defendants are entitled to qualified immunity. For the reasons set forth below, we will grant the defendants' motion in part and deny it in part.

## I. **Factual Background**

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court should, at the threshold, "accept all factual allegations in the complaint as true and give the pleader the benefit of all reasonable inferences that can be fairly drawn therefrom." <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 183 (3d Cir. 1993). As will be seen, Burke proffers no lack of detail for the "short and plain" statements that Fed. R. Civ. P. 8(a)(2) requires.

According to Burke's amended complaint, on April 6, 2008, around 9:30 P.M., he was working on his car in the driveway

of his home and listening to music from the car.  Am. Compl. at

¶¶ 12-13.  Burke's ex-wife, Dawn Welch ("Welch"), who was also

present at his home, asked him to turn down the music.  It is

unclear from his complaint whether Burke did so.  What the

complaint does make clear is that Welch ultimately telephoned the

Cheltenham Police Department, which promptly sent three officers

to the scene.  Am. Compl. at ¶¶ 14-15.

Officers Michael Corbo ("Corbo") and Chiofolo

("Chiofolo") -- the complaint fails to supply the latter

officer's first name -- approached Burke and ordered him to turn

off or turn down his car radio and remove his keys from the car's

ignition.  Burke allegedly complied with both requests.  Am.

Compl. at ¶¶ 16-20.  Chiofolo asked Burke if he had been drinking

alcohol, and Burke responded that he had consumed a beer many

hours before, during the afternoon.  Am. Compl. at ¶ 21.

Chiofolo told Burke that "I ought to arrest you for

driving under the influence," and ordered Burke to place his

hands behind his back, but when Burke hesitated Chiofolo repeated

his order, informing Burke that he was being handcuffed "for

safety purposes."  Am. Compl. at ¶¶ 22-25.  As Chiofolo placed

the handcuffs on Burke, the plaintiff told him that he had nerve

damage in his left arm, as well as a weakened knee.  Am. Compl.

at ¶ 26. Burke claims that Chiofolo nonetheless unnecessarily tightened the handcuffs, causing him intense pain. Am. Compl. at ¶ 27.

The officers then ordered Burke to sit on the curb by the side of the road -- a request with which Burke allegedly complied -- returned to their cars for a time, then approached Burke and attempted to further interrogate him. This attempt proved unsuccessful because Burke had decided to stop answering the officers' questions. Am. Compl. at ¶¶ 28-30. The complaint asserts that this decision so agitated the officers that they ordered Burke to disrobe, which he began to do once they removed his handcuffs. Am. Compl. at ¶¶ 31-35. The officers demanded that Burke remove his shoes as well, and as Burke reached down to unlace his shoes he asked the officers why he had to undress in front of his neighbors. Am. Compl. at ¶¶ 36-37. The officers allegedly offered no response. Instead, Corbo and Chiofolo are said to have grabbed Burke by his upper arms and shoulders; they then violently threw him to the asphalt street where Burke's head and face hit the ground, causing him severe pain. Am. Compl. at ¶¶ 37-39.

There ensued an "unlawful assault" on a "non-resistant and defenseless Burke," as Burke puts it. Am. Compl. at ¶¶ 46,

4

40. The complaint avers that an officer pushed Burke's face into the asphalt and held it there while two other officers began violently ripping off Burke's clothing and removing his shoes, in the process intentionally gouging Burke's torso with their fingernails and/or other sharp objects. Am. Compl. at ¶¶ 41-43. Officer O'Neil ("O'Neil") -- again, the complaint supplies no first name -- intentionally and forcefully dropped his knee into the right side of Burke's face, striking him and causing him more intense pain, and the Complaint further depicts Burke being kicked in his injured left leg and repeatedly punched in his upper arms, chest, and shoulders. Am. Compl. at ¶¶ 44-45.

As Burke remained on the ground, still partially naked and said to be writhing in pain, the police allegedly instructed him to get dressed. He was then re-handcuffed, forced to his feet, and dragged to a police cruiser, where the complaint claims the defendant officers intentionally battered Burke's head on the hood of the police cruiser before depositing him in the cruiser. Am. Compl. at ¶¶ 46-49. Corbo then took Burke to the Cheltenham Police station and, rather than booking him, the three officers allegedly took him to the juvenile holding area. Am. Compl. at ¶¶ 50-51.

As Burke waited in the holding area, Officer Baskins

("Baskins") -- again left mononymic in the complaint --
approached him and allegedly again ordered him to disrobe.  Am.
Compl. at ¶ 52.  When Burke questioned the request, the complaint
avers that Baskins picked Burke up by his shoulders and proceeded
forcefully to slam him into a stone/concrete wall inside the
juvenile holding area, which induced Burke, out of fear and
intimidation, to strip off all his clothing, leaving only a
silver St. Jude medallion hanging around his neck.  Am. Compl. at
¶¶ 53-59.  Baskins allegedly demanded that Burke remove the
medallion, but Burke protested that he could not do so due to the
injuries he had sustained in his arrest at his house.  Am. Compl.
at ¶¶ 59-60.  In response, Baskins yanked the metal chain forward
and snapped it off the back of plaintiff's neck, causing him
severe pain.  Am. Compl. at ¶¶ 61-62.

"After this last of humiliations," the complaint
asserts that the police allowed Burke to dress himself.  He was
then processed and ultimately charged with public drunkenness and
disorderly conduct.  Am. Compl. at ¶¶ 63-64.  Burke was acquitted
on the former charge but pled guilty to the latter.  Am. Compl.
at ¶¶ 66-68.

On April 9, 2008, Burke filed a complaint with the
Internal Affairs unit at the Cheltenham Police Department, which

is headed by Lieutenant John Salmon ("Salmon"). Am. Compl. at ¶¶ 69-70. In this complaint, Burke alleged wrongful conduct by Corbo, Chiofolo, O'Neil, and Baskins. Burke was interviewed, and returned to the Police station on May 19, 2008 to review a typed copy of the interview. Am. Compl. at ¶¶ 70-74. On August 21, 2008, Burke learned that the Cheltenham Police Department had charged him with eight crimes: two counts of "Unsworn Falsification to Authorities," two counts of "Statement Under Penalty," two counts of "False Report - False Incrimination of Another," and two counts of "Obstruction of Administration of Law/Other Government Function." Am. Compl. at ¶¶ 76, 78. Burke claims that these charges were retaliatory. Am. Compl. at ¶ 77. Two of the charges were withdrawn prior to trial and Burke was acquitted of the remaining charges at a bench trial on March 8, 2010. Am. Compl. at ¶¶ 79-81.

## II. <u>Analysis</u>

As noted, Burke alleges eight distinct claims against some or all of the defendants, and defendants move, on a variety of grounds, for dismissal of some of them under Fed. R. Civ. P. 12(b)(6).

In recent years, "pleading standards have seemingly

shifted from simple notice pleading to a more heightened form of

pleading, requiring a plaintiff to plead more than the

possibility of relief to survive a motion to dismiss." Fowler v.

UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). A pleading may

not simply offer "labels and conclusions," Bell Atlantic v.

Twombly, 550 U.S. 544, 555 (2007). "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory

statements, do not suffice." Ashcroft v. Iqbal, 129 S. Ct. 1937,

1949 (2009). Moreover, "only a complaint that states a plausible

claim for relief survives a motion to dismiss," giving rise to a

"context-specific" inquiry that "requires the reviewing court to

draw on its judicial experience and common sense." Id. at 1950.

This standard is not as demanding as a "probability requirement,"

but it does oblige a plaintiff to allege facts sufficient to show

that there is "more than a sheer possibility that a defendant has

acted unlawfully." Id. at 1949 (internal quotation marks

omitted). "Factual allegations must be enough to raise a right

to relief above the speculative level," Twombly, 550 U.S. at 555,

though plaintiffs need only "nudge[] their claims across the line

from conceivable to plausible." Id. at 569.

In deciding a Rule 12(b)(6) motion, courts "consider

only the allegations in the complaint, exhibits attached to the

8

complaint, matters of public record, and documents that form the basis of a claim." <u>Brown v. Daniels</u>, 128 Fed. Appx. 910, 913 (3d Cir. 2005) (quoting <u>Lum v. Bank of America</u>, 361 F.3d 217, 222 n.3 (3d Cir. 2004)) (internal quotation marks omitted). A document forms the basis of a claim if it is "integral to or explicitly relied upon in the complaint." <u>Id.</u> (quoting <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997)) (emphasis omitted).

### A. **Official Capacity**

Burke asserts some of his claims against Corbo, Salmon, and John Norris (Chief of Police of Cheltenham Township) in their official capacities. "[O]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent," <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 n.55 (1978), and a court should treat such suits against public officers as if they were brought against the governmental entities for which they work. <u>See</u>, <u>e.g.</u>, <u>Mitros v. Cooke</u>, 170 F. Supp. 2d 504, 506 (E.D. Pa. 2001). Given that each of Burke's claims against Corbo, Salmon, and Norris in their official capacities is also asserted against the Township, we serve little purpose by retaining these claims

9

against the named police officers.  Thus, we will dismiss Count

IV -- alleging malicious prosecution -- with respect to Corbo,

Salmon, and Norris in their official capacities, and Count V --

alleging retaliation in violation of the First Amendment -- with

respect to Norris in his official capacity, while retaining these

claims against the Township of Cheltenham.

### B.    *Heck v. Humphrey* and Counts I, II, and III

Defendants argue that "certain of Plaintiff's claims

for violation of his civil rights, related to his April 6, 2008

arrest, are barred by the Supreme Court's ruling in Heck v.

Humphrey." Defs.' Mot. to Dismiss at 4.  In Heck v. Humphrey,

512 U.S. 477 (1994), that Court held that "in order to recover

damages for allegedly unconstitutional conviction or

imprisonment, or for other harm caused by actions whose

unlawfulness would render a conviction or sentence invalid, a §

1983 plaintiff must prove that the conviction or sentence has

been reversed on direct appeal, expunged by executive order,

declared invalid by a state tribunal authorized to make such

determination, or called into question by a federal court's

issuance of a writ of habeas corpus." Id. at 486-87 (footnote

omitted).  While defendants do not specify which counts of the

amended complaint this argument addresses, we will take it to

challenge Counts I and II -- against Corbo, Chiofolo, and O'Neil

("the arresting officers") and Baskins in their individual

capacities -- and Count III -- against the arresting officers and

Baskins in their individual capacities, and against the Township

-- since it is these counts that allege violations of Burke's

civil rights related to his arrest on April 6, 2008.

Defendants claim that since "[p]laintiff himself has

pled that he 'did tender a plea of guilty to disorderly conduct -

unreasonable noise,'" "probable cause for his arrest has been

indisputably established" and plaintiff's § 1983 claim cannot be

sustained. Defs.' Mot. to Dismiss at 5. For his part, plaintiff

responds that since he "was also charged with public drunkenness

as a result of the April 6, 2008, arrest" and "was subsequently

acquitted on that charge," he "has pled a successful outcome at

the lower Court level" as Heck requires. Pl.'s Resp. to Defs.'

Mot. to Dismiss at 7-9.

Heck does not require that any § 1983 claim for

unconstitutional conviction or imprisonment include a

demonstration that the conviction or sentence has been reversed

or otherwise called into question, as defendants seem to suggest

and plaintiff appears to accept. As the Supreme Court explained,

11

> [W]hen a state prisoner seeks damages in a §
> 1983 suit, the district court must consider
> whether a judgment in favor of the plaintiff
> would necessarily imply the invalidity of his
> conviction or sentence; if it would, the
> complaint must be dismissed unless the
> plaintiff can demonstrate that the conviction
> or sentence has already been invalidated.
> But if the district court determines that the
> plaintiff's action, even if successful, will
> not demonstrate the invalidity of any
> outstanding criminal judgment against the
> plaintiff, the action should be allowed to
> proceed, in the absence of some other bar to
> the suit.

512 U.S. at 487 (emphasis in original)(footnote omitted). Heck,
then, teaches that we must conduct two inquiries in evaluating a
§ 1983 claim: first, whether the claim suggests the invalidity of
an "outstanding criminal judgment against the plaintiff"; second,
if the claim does imply such invalidity, we must dismiss it
unless the plaintiff can demonstrate "that the conviction or
sentence has already been invalidated." Id. Taking up the
second inquiry first, Burke does not suggest in his complaint
that his conviction for disorderly conduct was ever invalidated.
Thus, the key question under Heck is whether his claims under
Counts I, II, and III imply the invalidity of this particular
conviction.

Count I of Burke's amended complaint alleges that his
arrest on April 6, 2008 constituted an "unlawful search or

12

seizure" on several grounds. Am. Compl. at ¶¶ 82-84. Burke

argues first that his "custodial detention was not predicated on

probable cause and served no legitimate governmental interest,"

and that "Officer Baskins contributed to unlawfully prolonging an

illegal seizure by detaining Burke against his will in the

juvenile holding area without probable cause." Id. at ¶¶ 90, 95.

These claims duplicate those in Count II where Burke alleges that

since "there were no facts within the knowledge of the officers

which were sufficient to warrant a prudent man in believing that

Burk [sic] had committed or was committing an offense," he was

falsely arrested and falsely imprisoned on April 6, 2008. Id. at

¶ 106. We will analyze both claims together.

    In evaluating a false arrest claim, "[t]he proper

inquiry . . . is not whether the person arrested in fact

committed the offense but whether the arresting officers had

probable cause to believe the person arrested had committed the

offense." Groman v. Township of Manalapan, 47 F.3d 628, 634 (3d

Cir. 1995) (quoting Dowling v. City of Phila., 855 F.2d 136, 141

(3d Cir. 1988)) (internal punctuation omitted). Moreover, "where

the police lack probable cause to make an arrest, the arrestee

has a claim under § 1983 for false imprisonment based on a

detention pursuant to that arrest." Id. at 636 (citing Thomas v.

13

Kippermann, 846 F.2d 1009, 1011 (5th Cir. 1988). It is at least

conceivable that arresting officers could lack probable cause to

arrest and detain even if the evidence later supports conviction

beyond a reasonable doubt. This could occur if the arresting

officers were not privy to all the information that _later_

supported conviction. Consequently, a plaintiff alleging false

arrest and false imprisonment need not _necessarily_ also imply the

invalidity of a later conviction.

Here, however, Burke pled guilty to disorderly conduct

under 18 Pa. C.S.A. § 5503(a)(2), which provides that "[a] person

is guilty of disorderly conduct if, with intent to cause public

inconvenience, annoyance or alarm, or recklessly creating a risk

thereof, he . . . makes unreasonable noise." Burke admits in his

complaint that on the evening of April 6, 2008, (1) he was

listening to music at a decibel level disturbing to Welch; (2)

after asking Burke to turn down the music, Welch called the

police; (3) upon arriving at the scene, Corbo told Burke to turn

down his radio; and (4) shortly thereafter, the arresting

officers placed Burke under arrest. Thus, at the time of arrest,

the arresting officers had access to all the information

regarding Burke's conduct on the evening of April 6, 2008 that

later supported his conviction for disorderly conduct -- either

second-hand, through Welch's complaint, or first-hand, through observation of Burke's behavior. Thus, it is not possible for Burke to argue that the arresting officers lacked probable cause to arrest and detain him without <u>also</u> arguing that his later conviction for disorderly conduct was invalid. <u>Heck v. Humphrey</u> thus forecloses Burke's claims of false arrest and false imprisonment under Counts I and II.

Burke next alleges that "[a] reasonable police officer . . . would not have restrained the Plaintiff in handcuffs." Am. Compl. at ¶ 94. A suspect challenging his restraint in handcuffs must show not only that the handcuffing officers did not have probable cause to arrest him, but also that there was "no basis to believe that the suspect pose[d] a threat or to fear his escape." <u>Hall v. Raech</u>, 677 F. Supp. 2d 784, 794 (E.D. Pa. 2010) (Yohn, J.). But Burke cannot challenge whether the defendant officers had probable cause to arrest him without also implying the invalidity of his later conviction, so we need not consider whether Burke could prove that he posed no threat or risk of escape. <u>Heck</u> forecloses Burke's claim under Count I that he was illegally restrained in handcuffs.

Third, Burke claims that "no facts exist demonstrating or justifying the need for the two strip searches." Am. Compl.

at ¶ 97.  We will examine the validity of these searches more
extensively in Part II.F, <u>infra</u>.  Generally speaking, however,
strip searches will be upheld under the Fourth Amendment if they
are "reasonable under the circumstances," <u>U.S. v. Clemons</u>, 2010
WL 597992, at *4 (W.D. Pa. 2010) (citing <u>Bell v. Wolfish</u>, 441
U.S. 520, 558-59 (1979)), where factors to consider include "the
scope of the particular intrusion, the manner in which it is
conducted, the justification for initiating it, and the place in
which it is conducted." <u>Wolfish</u>, 441 U.S. at 559.  Since Burke's
claim that the strip searches were unreasonable will thus focus
on the circumstances under which they occurred, and not his
ultimate culpability for an offense, he may contend that the
searches were unreasonable without claiming that his later
conviction was invalid.  Consequently, <u>Heck</u> does not foreclose
Burke's claim under Count I that he was unlawfully strip
searched.

Finally, Burke alleges in Count III that he was the
victim of excessive force in violation of the Fourth Amendment,
in light of "the lack of probable cause to effectuate the arrest"
and considering that "a reasonable police officer in the position
of either Corbo, Chiofolo, O'Neil, or Baskins would not have
employed such disproportionate force" given that "(i) Burke was

cooperating with the officers; and (ii) was evidently not armed or dangerous." Am. Compl. at ¶¶ 119, 121-22. As already discussed, Burke's assertion that his seizure was not justified by probable cause cannot advance without a concomitant challenge to his ultimate conviction for disorderly conduct; thus, Heck forecloses this ground. Regarding the latter ground, "[w]hen a police officer uses force to effectuate an arrest that force must be reasonable." Groman, 47 F.3d 628, 634 (3d Cir. 1995) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). Since Burke's disproportionate force claim will focus on the reasonableness of officers' conduct during his arrest and not the validity of his later conviction for disorderly conduct, his excessive force claim will survive Heck to the extent that it is predicated only on the use of such disproportionate force.

To recapitulate, Burke's conviction on the charge of disorderly conduct does not, under Heck, foreclose his civil rights claims under Count I for unlawful search and seizure based on his two strip searches or under Count III for the use of excessive force. Burke may demonstrate liability under each of these counts without impugning the validity of his later conviction for disorderly conduct. But Heck does bar Burke from pursuing two of the grounds asserted under Count I -- false

arrest and false imprisonment, and unlawful restraint in handcuffs -- as well as all of Count II and one of the grounds -- lack of probable cause -- asserted under Count III.

C.    The Fourteenth Amendment and Counts II and V

Defendants next contend that while "[p]laintiff brings civil rights claims under the First, Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983," the Fourteenth Amendment claim is "subsumed by his First and Fourth Amendment claim" and "should be dismissed with prejudice." Defs.' Mot. to Dismiss at 5-6. Burke responds with the observation that "[t]he only mention of the Fourteenth Amendment with respect to any specific claim in Plaintiff's Complaint is in Count II - False Arrest & False Imprisonment," and further asserts "that the Third Circuit Court of Appeals has recognized both a deprivation of Fourth and Fourteenth Amendment rights for this particular cause of action." Pl.'s Resp. to Defs.' Mot. to Dismiss at 10.

In <u>Groman v. Twp. of Manalapan</u>, 47 F.3d 628 (3d Cir. 1995) our Court of Appeals indeed explained that "[a] cause of action exists under § 1983 when a law enforcement officer uses force so excessive that it violates the Fourth and Fourteenth Amendments to the United States Constitution." <u>Id.</u> at 633-34

18

(citing <u>Brown v. Borough of Chambersburg</u>, 903 F.2d 274, 277 (3d Cir. 1990)). Since defendants concede that "[t]he First and Fourth Amendments are, of course, made applicable to the states by the Fourteenth Amendment," Defs.' Mot. to Dismiss at 5, it seems that what defendants seek here is merely the recognition that Burke does not have independent claims for false arrest and false imprisonment under both the Fourth and Fourteenth Amendments, or for retaliation, under both the First and Fourteenth Amendments.

While we endorse this characterization -- and plaintiff does not take issue with it -- we view with less favor the suggestion that Burke's Fourteenth Amendment claim "should be dismissed with prejudice." Burke asserts no independent claim under the Fourteenth Amendment. <u>Cf.</u> <u>Hall v. Raech</u>, 2009 WL 811503, at *3 (E.D. Pa. 2009) (Yohn, J.) (dismissing excessive force claims entirely predicated on the Fourteenth Amendment's due process standards). There is simply no claim to dismiss here.

D.    <u>Punitive Damages and Counts III, IV, V, and VI</u>

Defendants contend that "punitive damages may not be recovered against a governmental entity in an action brought

under 42 U.S.C. § 1983," Defs.' Mot. to Dismiss at 6 (citing <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 271 (1981)), and that punitive damages are similarly barred against "[d]efendant[s] in [their] official capacity[ies] only." <u>Id.</u> (brackets in original)(quoting <u>Mitros v. Borough of Glenolden</u>, 170 F. Supp. 2d 504, 508 (E.D. Pa. 2001)). Happily, plaintiff agrees, conceding (as he must) that "[t]o the extent Plaintiff's Amended Complaint asserts punitive damages against the Township or persons in their official capacities, said assertion was either in error or misconstrued by Defendants." Pl.'s Resp. to Defs.' Mot. to Dismiss at 10-11. Consequently, we will grant as unopposed defendants' request that "all claims for punitive damages against the Defendants in their official capacities, and against Cheltenham Township, must be dismissed with prejudice." Defs.' Mot. to Dismiss at 7.

Burke correctly maintains that he does not waive his "right to seek punitive damages against Defendant officers and other named Defendants in their individual capacities." Pl.'s Resp. to Defs.' Mot. to Dismiss at 11. This does no more than restate the Supreme Court's teaching in <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983), that "[a] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is

shown to be motivated by evil motive or intent, or when it

involves reckless or callous indifference to the federally

protected rights of others".

E.   <u>Municipal Liability and Counts III, IV, V, and VI</u>

Defendants contend that "[p]laintiff has identified no

. . . custom, practice or policy" that could support municipal

liability under <u>Monell v. Dep't of Soc. Servs.</u>, Defs.' Mot. to

Dismiss at 8, and that "[t]o the extent Plaintiff's claims can be

construed as claims of failure to train, discipline and

supervise, they fail, as well." <u>Id.</u> at 9.  Interestingly, Burke

admits that "it would be patently absurd to expect a Plaintiff to

be able to deduce and prove at the time of his pleading that an

offending municipality had a policy or custom which was the

moving force behind his or her constitutional violations without

some sort of limited discovery," Pl.'s Resp. to Defs.' Mot. to

Dismiss at 15.  He also concedes that "there is absolutely no way

Plaintiff, Burke, can demonstrate at the time of pleading as to

whether or not Cheltenham Township had tolerated known misconduct

in the past without some permit of discovery." <u>Id.</u> at 16.  But

Burke argues that he does not need to plead these facts in order

to survive a Rule 12(b)(6) motion, since "[t]he law shields

Plaintiff from having to prove his <u>Monell</u> claim and carrying a higher burden at the time of pleading." <u>Id.</u> at 14.

In order to show municipal liability under § 1983, as a general proposition a plaintiff must show that "the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." <u>McTernan v. City of York</u>, 564 F.3d 636, 657 (3d Cir. 2009) (citing <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978)).  Burke's amended complaint alleges wrongs not only by the Township, but by its Police Chief, Norris, who most certainly constitutes a municipal "decisionmaker" under <u>Monell</u>.  <u>See</u>, <u>e.g.</u>, <u>id.</u> at 658-59 (characterizing the police chief as a municipal decisionmaker).  Whether a municipal decisionmaker's actions constitute policy or custom that may give rise to municipal liability is, however, a complicated question.

Our Court of Appeals two decades ago summarized the <u>Monell</u> jurisprudence on this point:

> A governmental policy or custom can be established in two ways.  Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.  A course of conduct is considered to be a custom when, though not authorized by law, such practices of state officials are so permanent and well settled

22

as to virtually constitute law.

<u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1480 (3d Cir. 1990)
(brackets and internal quotation marks omitted).  This might seem
to suggest that only official edicts or well-settled practices
can support municipal liability.  The jurisprudence negates such
a suggestion.  In <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469,
483 (1986), the Supreme Court concluded that "where action is
directed by those who establish governmental policy, the
municipality is equally responsible whether that action is to be
taken only once or to be taken repeatedly."  In <u>Bd. of Cnty.</u>
<u>Comm'rs of Bryan Cnty. v. Brown</u>, 520 U.S. 397, 404 (1997), the
Court clarified: "it is not enough for a § 1983 plaintiff merely
to identify conduct properly attributable to the municipality.
The plaintiff must also demonstrate that, through its <u>deliberate</u>
conduct, the municipality was the 'moving force' behind the
injury alleged." (emphasis in original).  Under this test, "proof
that a municipality's legislative body or authorized
decisionmaker has intentionally deprived a plaintiff of a
federally protected right necessarily establishes that the
municipality acted culpably.  Similarly, the conclusion that the
action taken or directed by the municipality or its authorized
decisionmaker itself violates federal law will also determine

that the municipal action was the moving force behind the injury of which the plaintiff complains." Id. at 405.

Burke claims under Count IV that Norris initiated proceedings against him and chose to prosecute him maliciously, Am. Compl. at ¶¶ 144, 146, and under Count V asserts that Norris treated Burke adversely as a consequence of his filing a complaint. Id. at ¶ 153. Under Count VI, Burke alleges that Norris communicated a message of approval to the other defendant officers regarding their conduct when he decided to prosecute Burke on eight baseless charges. Id. at ¶ 166.

Respecting Count IV, "[t]o prove malicious prosecution under section 1983 when the claim is under the Fourth Amendment, a plaintiff must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir. 2007). Burke alleges two instances of malicious prosecution in his amended complaint: first, with respect to his arrest and prosecution for

public drunkenness resulting from the incidents of April 6, 2008, and, second, with respect to his prosecution on baseless charges after filing a complaint with the Cheltenham Township Internal Affairs unit. Burke does not allege the involvement of Norris or any other municipal decisionmaker in the first incident, and, regarding the second incident, he fails to allege that this prosecution resulted in any deprivation of his liberty as <u>Knorr</u> requires. Norris's alleged actions under Count IV, then, did not deprive Burke of a federally protected right; they do not give rise to municipal liability as a result.

Regarding Count V, to demonstrate a First Amendment retaliation claim under § 1983 a plaintiff must show "(1) constitutionally protected conduct, (2) an adverse action by [] officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his [constitutional] rights and the adverse action taken against him." <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003) (internal punctuation omitted). As our Court of Appeals has noted, "[t]he Supreme Court has clearly held that prosecution of a citizen in retaliation 'for nonprovocatively voicing his objection' to police conduct impermissibly punishes constitutionally protected speech," <u>Losch</u>

v. Borough of Parksburg, Pa., 736 F.2d 903, 910 (3d Cir. 1984)

(quoting Norwell v. City of Cincinnati, 414 U.S. 14, 16 (1973)).

Since Burke alleges in his complaint that "charges were brought

[by Norris] as a direct consequence of the filing of the

complaint," Am. Compl. at ¶ 153, Burke has made out a claim that

Norris's actions deprived him a federally-protected right.  Under

Bryan County, Burke has therefore asserted a viable claim against

the Township for retaliation in violation of the First Amendment.

As for Count VI, failure to train can be "thought of as

a city policy or custom" if it "reflects a deliberate or

conscious choice by the municipality."  City of Canton, Ohio v.

Harris, 489 U.S. 378, 389 (1989) (internal quotation marks

omitted).  Notably, Count VI is not like Counts IV or V, which

allege behavior that in and of itself deprived Burke of a

constitutional right; Burke can only claim under Count VI that

the municipality's failure to train eventually led to his injury.

Burke does not assert in his complaint, however, that Norris's

actions gave rise to a failure to train that resulted in injury

to him.  Instead, he contends only that Norris's decision to

prosecute Burke "communicated a message of approval to the

Defendant Officers with respect to their conduct."  Am. Compl. at

¶ 166.  Since such ratification of allegedly unlawful conduct

involves no cognizable injury to Burke, Norris's actions do not support a claim of municipal liability against the Township under Count VI.

Having examined Burke's claims regarding Norris, we now consider his claims with respect to the Township itself. In Counts III, IV, V, and VI, Burke alleges wrongdoing by the Township of Cheltenham. In Count III (alleging excessive force in violation of the Fourth Amendment and § 1983) Burke claims that "the use of excessive force by Officers Corbo, Chiofolo, O'Neil and Baskins was, is, and remains a part of a customary practice of the Cheltenham Police Department." Am. Compl. at ¶ 123. In Count IV, as part of his claim for malicious prosecution, Burke alleges that "Chief John Norris chose in his official capacity to, and the Township of Cheltenham ultimately did, prosecute Burke maliciously." Id. at 144. In the same Count he avers that "Lt. Salmon, Chief Norris, and Defendant, [sic] Township initiated the proceeding without a scintilla of probable cause in an attempt to squash [sic] the Complaint," id. at 146, and that "[d]efendant Township attempted to cover-up the damning recitation of facts and also attempted to deflect embarrassment to the Cheltenham police force by ruining Burke's name." Id. at 147. And, in Count V (alleging retaliation in

27

violation of the First Amendment) Burke claims that "[a]s a result of making such speech he was adversely treated by the Township of Cheltenham, Chief John Norris, and Lieutenant Salmon when charges were brought as a direct consequence of the filing of the complaint." Id. at 153. Finally, in Count VI (failure to protect and prevent because of inadequately training) Burke alleges that "[t]he inadequately trained Defendants during their assault and false imprisonment of Burke acted, knowingly, recklessly, or with gross negligence, pursuant to official policy or custom," id. at ¶ 159. He also claims that "the Township of Cheltenham has wholly failed its duty to instruct, supervise, control, and discipline on a continuing basis Officers Corbo, Chiofolo, O'Neil, Baskins and Lt. Salmon," id. at ¶ 160, and that "[d]efendant Cheltenham Township had knowledge or, had the Police Department diligently exercised its duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs . . . committed by the Defendant Officers were about to, or were likely to be committed." Id. at ¶ 161.

We need not belabor Burke's allegations about the Township under Count V since we have already sustained his claim for municipal liability against the Township under that Count

based upon Norris's actions.  Turning to Count IV, we find that, while it alleges wrongdoing by the Township of Cheltenham, it simply fails to state a claim for municipal liability.  Even if we take these allegations as well-pled, they do not suggest the existence of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the Township's] officers," or "constitutional deprivations visited pursuant to governmental 'custom,'" as <u>Monell</u> requires.  Burke anthropomorphizes the Township and then accuses it of wronging him in much the same way that he accuses the individual defendant officers of lawlessness against him.  Such <u>respondeat</u> <u>superior</u> allegations are not the stuff of <u>Monell</u> liability under § 1983.

Counts III and VI suffer from the opposite problem: in each count Burke alleges a policy or customary practice on the part of the Township underlying the stated violations, but his allegations constitute no more than conclusory statements, appended to the claims against the defendant police officers, that each violation occurred "because of official policy or custom."  To be sure, Burke need not satisfy a "heightened pleading standard" to make out a § 1983 claim as <u>Leatherman v.</u> <u>Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 168 (1993) teaches.  But as with any complaint, Burke

must provide "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (internal quotation marks omitted). Burke fails to present any facts regarding an official policy or custom on the part of the Township that caused civil rights violations to be made against him. Instead, he offers only bald assertions that such policies or customs existed without any support that would suggest that what happened to him on April 6, 2008 were not idiosyncratic actions of individual public actors. Cf. Hall v. Raech, 2009 WL 811503, at *5 (E.D. Pa. 2009) (refusing to dismiss Monell claims where plaintiff identified a specific training deficiency, explained why prior events should have demonstrated to the municipality the need for training, and averred that the deficiency caused the violation of his constitutional rights); A. v. Nutter, 2010 WL 3420106, at *14 (E.D. Pa. 2010) (refusing to dismiss Monell claims where plaintiffs alleged longstanding lack of compliance with child safety standards despite documented knowledge by municipal decisionmakers of areas of concern).

Burke's claims against the Township in Counts III, IV, and VI must therefore be dismissed, while the municipal liability claim in Count V must be sustained. Since the Township was the

only defendant named in Count VI, we will dismiss that Count in whole.  We will also dismiss Count IV in its entirety since we earlier dismissed Burke's claims against the other defendants -- Corbo, Salmon, and Norris in their official capacities -- under that Count.

F.    The Individual Defendants' Right to Qualified Immunity

Defendants suggest that they "are entitled to qualified immunity," though they do not elaborate on the grounds for this claimed entitlement beyond discussing some of the applicable case law.  Defs.' Mot. to Dismiss at 13.  Burke replies that the individual defendant officers are not entitled to qualified immunity inasmuch as they "did not make any reasonable mistakes as to what the law requires", but instead "wholly disregarded the law and abused their authority as police officers when they employed unnecessary force, caused unreasonable searches, and effectuated a baseless arrest on Plaintiff for public drunkenness without having probable cause therefor."  Pl.'s Resp. to Defs.' Mot. to Dismiss at 21.

A state official charged with both federal civil rights and pendent state tort claims may assert immunity with respect to both types of claims, but the standard governing immunity in each

case is different.  Federal "qualified immunity" has been
established by case law, <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 807
(1982) ("Our decisions have recognized immunity defenses of two
kinds"), but "official immunity" with respect to state claims in
Pennsylvania is a creature of statute.  <u>See</u> 42 Pa. C.S.A. §§
8541-64.  And while "Pennsylvania's official immunity standard is
a subjective test . . . Section 1983's standard is an objective
test."  <u>DeBellis v. Kulp</u>, 166 F. Supp. 2d 255, 281 n.28 (E.D. Pa.
2001).  Defendants' motion to dismiss, as already noted, offers
only limited analysis in support of defendants' assertions of
immunity, but what analysis is furnished all focuses on
"qualified immunity" and federal case law elaborating on this
topic.  Notably, defendants' motion to dismiss does not cite 42
Pa. C.S.A. §§ 8541-64 or even mention "official immunity" under
Pennsylvania law.  We will thus take defendants' motion to
dismiss as asserting only qualified immunity with respect to
Burke's federal law claims under § 1983, and not official
immunity with respect to Burke's pendent state tort claims.

     Since the privilege of qualified immunity "is an
immunity from suit rather than a mere defense to liability,"
<u>Saucier v. Katz</u>, 533 U.S. 194, 200-01 (2001) (emphasis and
internal quotation marks omitted), a court should address the

issue "at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991). Because "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow v. Fitzgerald, 457 U.S. at 818, "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

As the Supreme Court noted in Saucier v. Katz, courts do this inquiry in two steps. First, a court asks whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. 533 U.S. at 201. Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. This subinquiry probes whether there is "sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally

prohibited." <u>McKee v. Hart</u>, 436 F.3d 165, 171 (3d Cir. 2006).

But the Supreme Court recently clarified that <u>Saucier</u>'s two-step

sequence is not obligatory. "The judges of the district courts

and the courts of appeals should be permitted to exercise their

sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of

the circumstances in the particular case at hand." <u>Pearson v.</u>

<u>Callahan</u>, 129 S. Ct. 808, 818 (2009).

Burke alleges four constitutional violations at the

hands of the individual defendant officers, but only three have

survived our analysis thus far.[1]  We will subject each Count to

the analysis prescribed in <u>Pearson</u> and <u>Saucier</u>, beginning with

Count I in which Burke asserts that "[t]he Defendant Officers

also worked violations of the Plaintiff's Fourth Amendment right

to be free of unreasonable searches when the Defendant Officers

subjected him to two illegal strip-searches - one at Fenton Road

and one in the Juvenile Holding Area of the Cheltenham Township

Police Department."  Am. Compl. at ¶ 96.

---

[1] Specifically, Count I, alleging unlawful search and
seizure under the Fourth Amendment (though we have only retained,
under this count, Burke's claim that he was illegally strip
searched); Count III, alleging excessive force under the Fourth
Amendment; and Count V, alleging retaliation in violation of the
First Amendment.

With respect to searches and seizures, "[t]he essential
purpose of the proscriptions in the Fourth Amendment is to impose
a standard of reasonableness upon the exercise of discretion by
government officials, including law enforcement agents, in order
to safeguard the privacy and security of individuals against
arbitrary invasions." Delaware v. Prouse, 440 U.S. 648, 653-54
(1979) (internal quotation marks omitted).  We shall begin our
analysis by dividing strip searches into two classes -- those
occurring at detention facilities and those incident to arrest.

Regarding the former, in 1979 the Supreme Court
concluded, after considering "the scope of the particular
intrusion, the manner in which it is conducted, the justification
for initiating it, and the place in which it is conducted," Bell
v. Wolfish, 441 U.S. 520, 559 (1979), that a policy requiring all
inmates at Bureau of Prison facilities to "expose their body
cavities for visual inspection as a part of a strip search
conducted after every contact visit with a person from outside
the institution" was reasonable under the Fourth Amendment.  Id.
at 558.  Over the next three decades, nearly every Circuit -- but
not our Circuit -- interpreted Wolfish to mean "that an arrestee
charged with minor offenses may not be strip searched consistent
with the Fourth Amendment unless the prison has reasonable

35

suspicion that the arrestee is concealing a weapon or other

contraband." Florence v. County of Burlington, 2010 WL 3633178,

at *1 (3d Cir., Sept. 21, 2010) (summarizing circuit

jurisprudence).  Beginning in 2008, however, two circuits

reversed themselves and "upheld a blanket policy of strip

searching all arrestees" upon entering the general population of

a jail, id., and last month our Court of Appeals in Florence

upheld blanket strip search procedures at two county correctional

facilities "at the time of intake before arrestees enter the

general population."  Id. at *13.

Our Court of Appeals did admit in Florence that a

blanket policy reduced the "potential for abuse" present in a

strip search policy founded on official discretion.  Id.  This

might be taken as a suggestion that only blanket strip search

policies in detention facilities pass constitutional muster but

not policies giving officials the option to strip search any

arrestee without individualized suspicion.

Even though the strip search in question here occurred

in April of 2008 -- well before our Circuit decided Florence --

we cannot find that the right of an arrestee -- even one charged

with a minor offense -- not to be strip searched while in a

correctional facility was "clearly established" twenty-eight

months ago.  Baskins is therefore entitled to qualified immunity with respect to Burke's unlawful search and seizure claims arising out of the strip search of Burke at the Cheltenham Township Police station.

Regarding strip searches incident to arrest, however, Judge DuBois has recently noted that "[n]o Supreme Court case discusses the constitutionality of strip searches incident to arrest, which appear to fall between the 'full searches' considered by Robinson and the 'intrusions beyond the body's surface' considered by Schmerber."  Allison v. GEO Group, Inc., 611 F. Supp. 2d 433, 442 (E.D. Pa. 2009) (referring to U.S. v. Robinson, 414 U.S. 218 (1973), and to Schmerber v. California, 384 U.S. 757 (1966)).

But the factors elucidated in Wolfish that must be considered before ruling on whether a strip search in prison is reasonable -- "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted," id. 441 U.S. at 559 -- all militate against the legality of the street strip search described in Burke's complaint.  According to Burke, he was strip searched to the point where he was "partially naked."  Am. Compl. at ¶ 46.  The search allegedly occurred through the exertion of

great force, as one officer pushed Burke's face "into the asphalt" and the other two "began violently ripping off Burke's clothing and removing his shoes", id. at ¶¶ 41, 42.  It also does not appear that the officers had much justification for their search, since Burke was not accused of possessing contraband or engaging in violent conduct.  And of course the strip search allegedly occurred in a public place -- the street.  Id. at ¶ 46.

The Supreme Court has stated -- to be sure, in dicta -- that "the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street, [though] the practical necessities of routine jail administration may even justify taking a prisoner's clothes before confining him," Illinois v. Lafayette, 462 U.S. 640, 645 (1983).  Thus a public strip search that fails the four-factor test of Wolfish would necessarily be unreasonable given that Wolfish explicitly dealt with strip searches in prisons.

Applying Wolfish to Burke's version of the facts, then, we conclude on this limited record that the arresting officers violated the Fourth Amendment when they searched Burke on Fenton Road.  While this satisfies only the first prong of Saucier, what little precedent there is dealing with public strip searches suggests that such searches violate clearly established rights

under <u>Saucier</u>'s second prong.  Judge DuBois noted that "several circuit courts have ruled that strip searches are not included in the category of permissible searches incident to arrest," <u>Allison</u>, 611 F. Supp. 2d at 442.  In <u>Butler v. Hartlaub</u>, 2009 WL 199788, at *2 (M.D. Pa. 2009), Judge Kane also concluded that an allegation of a public strip search raises "potential Fourth and Fourteenth Amendment violations."  Moving outside of our Circuit, in <u>Moore v. Hearle</u>, 639 F. Supp. 2d 352, 358 (S.D.N.Y. 2009), Judge Robinson held -- persuasively, in our view -- that "[t]he right to be free from unreasonable searches, including public strip searches, is a clearly established constitutional right."

An issue of fact remains as to whether Burke was truly "strip-searched," given that he alleges only that he was left "partially naked."  Am. Compl. at ¶ 46.  Courts have suggested that for a strip search to have occurred, the suspect must at least have been compelled to expose "his genitals and buttocks," <u>Lee. v. City of South Charleston</u>, 668 F. Supp. 2d 763, at 775 n.3 (S.D.W. Va. 2009), if not "to remove all of [his] clothing and subject [his] naked bod[y] to visual inspection."  <u>Florence</u>, 2010 WL 3633178, at *2.  But heeding the admonition that the pleader should be given the benefit of "all reasonable inferences" in deciding a Rule 12(b)(6) motion, we will read Burke's amended

complaint as alleging that an intrusion rising to the level of a strip search occurred on Fenton Road. Having satisfied both of the Saucier prongs, we will therefore deny Corbo, Chiofolo, and O'Neil qualified immunity as to Count I of Burke's complaint, but only respecting the search that occurred on Fenton Road.

In Count III, Burke alleges that "Corbo, Chiofolo, O'Neil, and Baskins, made unreasonable and forceful contact with Plaintiff's person which under the circumstances was an excessive use of force." Am. Compl. at ¶ 118. According to our Court of Appeals's decision in Rivas v. City of Passaic, 365 F.3d 181 (3d Cir. 2004):

> A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable. . . . The inquiry turns on objective reasonableness, meaning that the standard is whether the police officer's actions [were] objectively reasonable in light of the facts and circumstances facing the officer, regardless of the officer's intent or motivation.

Id. at 198 (internal quotations omitted).

Burke alleges that the named officers used excessive force against him, in part, because they lacked probable cause to arrest him -- a ground we have already dismissed as foreclosed by Heck v. Humphrey. But Burke's complaint also describes a series

40

of violent actions by Corbo, Chiofolo, O'Neil, and Baskins during and after his arrest.[2]

Taking the allegations in Burke's complaint as true, the asserted actions of the arresting officers were unreasonable. The Supreme Court has suggested that reasonableness under the Fourth Amendment can only be judged through "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989). By Burke's account, he was accused only of a minor, nonviolent offense and he did not pose a serious threat to anyone. He was not actively resisting arrest. Against these claimed realities, the roughness with which he was treated by Corbo, Chiofolo, O'Neil, and Baskins seems at this juncture excessive, and hence

---

[2] Stating, for example, that Burke was thrown to the ground, that he was held there while his clothes were torn off and his skin was gouged, that he was kicked and repeatedly punched, that his head was intentionally battered against the roof of the police cruiser as he was transported to the police station, and that he was slammed into a wall at the police station's juvenile holding area. Am. Compl. at ¶¶ 38-45, 49, 55. Burke also alleges that "it was clear that: (i) Burke was cooperating with the officers; and (ii) was evidently not armed or dangerous." Am. Compl. at ¶ 122.

unreasonable under the Fourth Amendment.  Moreover, we do not imagine that any reasonable officer would not have known that such roughness was excessive and unlawful under the circumstances.  Consequently, we will deny the officers' assertions of qualified immunity with respect to Count III.

In Count V, Burke argues that he "engaged in constitutionally protected speech when he submitted his Internal Affairs Complaint," and that "engaging in protected speech was the substantial, motivating factor - in fact it is on the only factor [sic] - in causing the Township's retaliation against him in the form of a baseless prosecution."  Am. Compl. at ¶¶ 152, 154.  Since we have dismissed this Count against Norris in his official capacity, we are left only to consider whether Salmon has qualified immunity under this Count.

Burke alleges in his amended complaint that he "filed the Internal Affairs complaint on April 9, 2008, alleging wrongful conduct of Officers Corbo, Chiofolo, O'Neil and Baskins stemming from his April 6, 2008 arrest," Am. Compl. at ¶ 70.  Burke also alleges that "[o]n August 21, 2008, [he] received notice that he had been charged with eight (8) crimes by the Cheltenham Police Department," id. at ¶ 76, and that "[a]s a result of making such speech he was adversely treated by the

Township of Cheltenham, Chief John Norris, and Lieutenant Salmon when charges were brought as a direct consequence of the filing of the complaint." Id. at ¶ 153. As explained in Part II.E, supra, our Court of Appeals has noted that "[t]he Supreme Court has clearly held that prosecution of a citizen in retaliation 'for nonprovocatively voicing his objection' to police conduct impermissibly punishes constitutionally protected speech," Losch, 736 F.2d at 910 (quoting Norwell v. City of Cincinnati, 414 U.S. 14, 16 (1973)). Since Burke has alleged that (1) he voiced objections to police conduct after which (2) he was prosecuted and (3) Salmon lodged the prosecution in retaliation for his objections, Burke has adequately pleaded a violation of a clearly established constitutional right. Consequently, we will deny qualified immunity to Salmon under Count V.

BY THE COURT:


__\s\Stewart Dalzell